**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

MERCHANT TRANSACTION
SYSTEMS, INC.,

              Plaintiff,

vs.

NELCELA, INC., an Arizona
Corporation; LEN CAMPAGNA, an
Arizona resident; ALEC
DOLLARHIDE, an Arizona resident;
EBOCOM, INC., a Delaware
Corporation; POST INTEGRATIONS,
INC., an Illinois Corporation,

              Defendants.
_____

And Related Counterclaims, Cross-Claims,
and Third-Party Claims.
_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CV 02-1954-PHX-MHM

**ORDER**

        Currently before the Court is the parties' briefing and proposed orders and
objections on the issue of analytical dissection (Dkt. #s 560, 565, 572, 600, 601, 602,
603).  After reviewing the pleadings and holding oral argument on March 11, 2008, the
Court issues the following order.

**I.      THE PARTIES**

        On October 3, 2002, Plaintiff Merchant Transaction Systems, Inc. ("MTSI")
instigated a civil action relating to copyright infringement.  (Dkt. #1).  MTSI's Complaint
alleged that  Defendant Alex Dollarhide breached his fiduciary duty and duty of

confidentiality when he, along with Defendant Leonard Campagna and their corporation Nelcela, Inc. (collectively, "Nelcela"), sold MTSI's software to Defendants Ebocom, Inc. and Post Integrations, Inc.  (Id.).  MTSI also asserted a declaratory judgment and quiet title claim with respect to its ownership rights in its software ("MTSI software"), which was allegedly converted by Nelcela.  (Id.).  Nelcela answered MTSI's claims and counterclaimed against MTSI, asserting various claims including copyright infringement and declaratory relief as to its ownership rights in its software (the "Nelcela software").  (Dkt. #50).  Nelcela also asserted cross-claims and third-party claims against Ebocom, Inc., Post Integrations, Inc., Mary Gerdts, and  Douglas McKinney (collectively,"Post").  (Id.).  In response, Post cross-claimed and asserted third-party claims against Nelcela, including a claim that Nelcela breached their contractual obligation to Post pursuant to an August 2, 2000 agreement in which Nelcela was to provide its Nelcela System source code to Post.  (Dkt. #51)  Post also asserted a declaratory claim regarding its ownership rights in the Nelcela software.  (Id.).

In addition, on June 13, 2005, Lexcel Solutions, Inc. ("Lexcel") moved to intervene as a plaintiff in this litigation.  (Dkt. #169).  The Court granted Lexcel permission to intervene (Dkt. #209), and on July 29, 2005, Lexcel filed an Intervening Complaint, alleging that Nelcela engaged in copyright infringement of Lexcel's software by unlawfully converting Lexcel's software.  (Dkt. #212).

**II.    THE ISSUES**

This litigation primarily involves claims of copyright infringement of computer software.  To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) unauthorized copying of protected elements of the copyrighted work.  See Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1174 (9th Cir. 2003) ("In order '[t]o establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'") (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)).  Here, the parties stipulated to bifurcate the action into two phases tracking the elements of copyright

1   infringement: (1) ownership and (2) infringement/damages.  (Dkt. #87).  The stipulation
2   provided that the "issue of ownership shall be bifurcated and tried expeditiously.  In the
3   Ownership phase, discovery shall be limited to Ownership."  (Id., p.1).

4          Phase I, the ownership phase, is complete: on September 30, 2006, the Court held
5   on summary judgment that "based upon the undisputed similarities between the Lexcel
6   2001 software, MTSI software and Nelcela software . . . they are substantially similar
7   beyond the possibility of random chance and that copying took place" (Dkt. #383, p.28);
8   trial was then held to determine who owned that software (i.e., the authorization and
9   merchant systems), and on April 24, 2007, the jury found that Lexcel was the owner (Dkt.
10  # 501).  The jury also found that Lexcel possessed a valid copyright over the "database
11  component or system" of the Lexcel software.  (Id., p.2).  Therefore, Lexcel has proven
12  the first element of infringement.

13         As a result of the bifurcation, the Court was to then proceed to Phase II, the
14  infringement phase, at which time the Court would consider, among other things, whether
15  Nelcela copied any protected elements of the Lexcel software without authorization.
16  However, the transition to Phase II of this action became complicated when Nelcela
17  raised the issue of analytical dissection in its Motion for Judgement as a Matter of Law
18  during the Phase I trial on ownership.  (Dkt. #486).  For the first time in this action,
19  Nelcela argued that the Court's September 30, 2006 ruling that the various software at
20  issue were substantially similar was erroneous because "the Court was required to engage
21  in analytic dissection in order to identify the software that was eligible for copyright
22  protection" (Dkt. #600, p.2).  The Court denied that motion as untimely, to be reurged
23  after the Phase I trial; Nelcela then reurged the analytical dissection issue in its Renewed
24  Motion for Judgment as a Matter of Law and/or Motion for Judgment Notwithstanding
25  the Verdict or, in the alternative, Motion for a New Trial.  (Dkt. #505, pp. 5-10).
26  Although the Court denied that motion as well, the Court held that the jury's "ownership
27  determination [must] face scrutiny based upon the requisite 'analytical dissection.'" (Dkt.
28  #547, p.15).  This order addresses the issue of analytical dissection.

1

### A.     Waiver

2      The Joint Parties argue that Nelcela waived its challenge to the Court's summary

3  judgment ruling and the jury's verdict by "fail[ing] to raise its analytic dissection defense

4  in opposition to the Joint Parties' motion for summary judgment." (Dkt. #601, pp. 13-

5  15). Nelcela, on the other hand, argues that it cannot have waived the issue of analytical

6  dissection because the Joint Parties carry "the burden to show that [the copied unlicensed,

7  protected] elements constitute protectable expression." (Dkt. #603, p.2).

8      The Court notes that the issue of waiver is entangled in the parties' present

9  conceptions of what was and was not decided in Phase I. Unfortunately, the stipulated

10  bifurcation has caused much confusion and led the parties to repeatedly squabble over

11  whether, and to what extent, certain issues were involved in Phase I, and what was to be

12  reserved or remained for Phase II. Looking back, the parties stipulated to bifurcate the

13  issues of ownership and infringement/damages in this action on March 11, 2005. (Dkt.

14  #87). However, due to Post Integrations' subsequent statement that "MTSI is not entitled

15  to have a jury determine ownership with respect to its request for declaratory relief

16  settling the question of ownership between it and POST" (Dkt. #88), Nelcela requested

17  that the Court clarify the issues to be considered in Phases I and II. (Dkt. #93). Although

18  the Court held a hearing on March 31, 2005 on the request for clarification, the Court was

19  required "to hold off on the ownership dispute because [the parties] ha[d] not been able to

20  determine what it is that [they] need[ed] to turn over." (Dkt. #126, p.41). Nonetheless,

21  the parties agreed at that time that the questions to be resolved in Phase I, the ownership

22  phase, was the following: "[W]ho owns the software that Nelcela [claims it owns]? Who

23  owns the software that MTSI claims it owns? And who owns the software that Nelcela

24  claims POST is infringing upon?" (Id., p.33).

25      However, disagreement concerning the bifurcation was evident again when

26  Nelcela sought summary judgment in Phase I on MTSI's unfair competition,

27  misappropriation, conversion, and intentional interference with economic relations claims

28  and Lexcel's copyright, misappropriation, unfair competition, breach of contract, and

conversion claims (which Nelcela claims are barred by the statute of limitations).  (Dkt. #s 323-25).  In Response to Nelcela's motions, the Joint Parties[1] reasserted its position that "Phase I was limited to the issue of software ownership" (Dkt. #351, p.23), and that Nelcela's motions on the aforementioned claims were "Phase II claims" (id., p.24).  But in Reply, Nelcela opined that the Court "understood that 'Phase I' has involved extensive questions regarding copyright infringement" and that "there were issues of both Phases involved at this time."  (Dkt. #361, p.8).  The Court understood no such thing; on September 30, 2006, the Court found that "the Parties, especially Nelcela, ha[d] asserted argument [sic] that address[ed] issues outside the scope of the ownership phase of this litigation," and as such, "the Court [would] not entertain the merits of [those] arguments that [fell] outside the scope of the ownership phase" (Dkt. #383, p.3), which included the merits of Nelcela's statute of limitations argument against Lexcel (id., pp. 16-17).

The Court was forced to again address the issue of bifurcation at the Final Pretrial Conference proceedings held on April 3 and 4, 2007, when Nelcela sought to have its experts "come in and testify [during the Phase I trial] in accordance with their reports and their disclosed testimony about where there are any similarities, where there are not similarities, and the nature of the similarities amongst all of the codes."  (Dkt. #474, p.10).  However, the Court reiterated the fact that on Phase I summary judgment it "found copying between the Lexcel CD, the Nelcela code, and the MTSI code.  And at this point, this includes both the Authorization and the Merchant code."  (Dkt. #474, p.11).  As such, the Court limited the expert testimony on copying in the Phase I trial to "the relationship

---

[1]On February 15, 2006, Post and MTSI filed a Stipulation for Partial Dismissal of Certain Claims Pursuant to Settlement.  (Dkt. #322).  The Stipulation stated that "the Lexcel Parties, MTSI Parties, and the POST Parties have mutually released each other from all claims related to the circumstances alleged in the present lawsuit.  The Settlement Agreement and Mutual Release does not release any claims asserted by the parties to that agreement against any of the Nelcela Defendants."  (Id., p.2) (emphasis in original).  As such, the Lexcel, MTSI, and POST Parties, are now referred to in this litigation as the "Joint Parties."

between the '94/'95 Lexcel software and the 2001 Lexcel CD, but not with respect to whether copying took place in 2001." (Id., pp. 18, 25). In addition, the Court again emphasized that due to the parties' stipulation to bifurcate the litigation, the Phase I trial was to determine ownership, and nothing more. (Id., p.89).

Still, the Court's pronouncements were apparently not clear enough, as Nelcela further inquired into whether its statute of limitations argument against Lexcel's claims would be addressed during the Phase I trial. (Dkt. #462, p.14). Once more, the Court stated that "[t]he issue for trial as to ownership is somewhat narrow now due to the Court's prior determination that copying occurred between the relevant software versions." (Id., p.37). Further, the Court stated that "[i]t seems in phase II of this litigation, if Lexcel is deemed to be the owner by the jury in phase I, Nelcela clearly will be afforded the opportunity to challenge Lexcel's claim for copyright infringement against Nelcela based upon the applicable statute of limitations and when Lexcel's infringement claims accrued."[2] (Id., p.21). As such, the Court concluded that "the issue as to ownership over the relevant software between the joint parties and Nelcela, would

_____

[2]On October 15, 2007, Nelcela filed a Post Trial Memorandum on Statute of Limitations, reasserting its position that Lexcel's copyright claims are barred by the statute of limitations. (Dkt. #575). The Court addressed the statutes of limitations issue at the Motions Hearing on March 11, 2008, stating that "[t]he question here, . . . is whether Nelcela's assurances that it would not and was not using Lexcel's source code is sufficient conduct to toll the statute of limitations and allow Lexcel to obtain damages for any infringement that occurred prior to June 13, 2002." (Dkt. #597, pp. 21-22). The Court went on: "it's unclear . . . whether Nelcela's acts were calculated to mislead Lexcel as to have reasonably caused Lexcel's failure to file suit at that time and thus whether equitable estoppel applies to bar Lexcel's claim of infringement prior to June of 2002. And it seems like where the facts are undisputed, and only one inference may be drawn from them, the question of estoppel is one of law. But otherwise, it is one of fact." (Id., pp. 21-22); see, e.g., Atkins v. Union Pacific Railroad Co., 753 F.2d 776, 777 (9th Cir. 1985); Weber v. Geffen Records, Inc., 63 F.Supp.2d 458, 466 (S.D.N.Y. 1999). As such, the Court found that "[i]t appears inappropriate for the Court to foreclose discovery or [sic] this issue [during discovery in Phase II] or issue an order stating that Lexcel is foreclosed from seeking to establish an [sic] equitable estoppel exists to allow it to recover for acts of infringement by Nelcela prior to June 13 of 2002." (Dkt. #597, pp. 22).

1    not . . . become an open question again. . . . regardless of whether Lexcel is deemed to

2    own or be the creator of the relevant software, and this Court subsequently invalidates

3    Lexcel's legal ownership rights during phase II."  (Id., pp. 21-22; Dkt. #457, pp. 12-13).

4         Then, as previously mentioned, during the trial on ownership, Nelcela raised the

5    issue of analytical dissection, arguing that the Court's September 30, 2006 ruling that the

6    various software at issue were substantially similar was erroneous because the Court had

7    not engaged in analytic dissection in order to identify the software that was eligible for

8    copyright protection. (Dkt. #486).  That argument was incorrect and premature; analytical

9    dissection is an examination into whether a party infringed a valid copyright by copying

10   constituent elements of the work that are original, and as such it is an issue solely for

11   Phase II, the infringement/damages phase.  The Court's September 30, 2006 finding that

12   the Lexcel 2001 software, MTSI software, and Nelcela software were "substantially

13   similar beyond the possibility of random chance and that copying took place" (Dkt. #383,

14   p.28), and the jury's subsequent determination that Lexcel owned that software, neither

15   addresses nor prevents an analysis into whether Nelcela copied any protected elements of

16   the Lexcel software without authorization.  The September 30, 2006 ruling merely found,

17   as a factual proposition, that copying occurred.  In other words, although the Court used

18   the term "substantially similar," which may have led to some confusion,[3] the Court's

19   finding related only to the probative similarity of the Lexcel, MTSI, and Nelcela software.

20        The Court's finding with respect to probative similarity between the software at

21   issue was a necessary part of the Phase I ownership issue.  Analytic dissection and

22   substantial similarity, on the other hand, are creatures of infringement, and their relevance

23   is limited to determining whether Nelcela's copying is actionable (i.e., whether the

24   particular features/elements of the Lexcel software that Nelcela allegedly copied are

25

26        [3]See 4 NIMMER ON COPYRIGHT § 13.03[A] ("Although the term 'substantial similarity'
27   often is invoked as a proxy to prove copying as a factual proposition, we have seen that the
     term 'probative similarity' is to be preferred in that context and the question of 'substantial
28   similarity' arises analytically only thereafter.").

protected by copyright).[4]  As such, pursuant to the parties' stipulation on bifurcation, those issues are the subject of Phase II.  Further, as the Court stated in its August 21, 2007 order, "should it be determined that Lexcel's claims for copyright infringement are based upon overlapping software versions that are common in nature and not protectable, Lexcel's claims based upon copyright ownership and infringement may be invalided." (Dkt. #547, p.15).  See, e.g., Feist Publ'ns, 499 U.S. at 361 ("Not all copying, however, is copyright infringement."); 4 NIMMER ON COPYRIGHT § 13.03[A] ("[E]ven where the fact of copying is conceded [or established], no legal consequences will follow from that fact unless the copying is substantial.").  Accordingly, despite the Joint Parties' contention to the contrary, as well as the fact that Nelcela prematurely raised the issue of analytical dissection and incorrectly argued that it applied to the Court's finding of probative similarity and the jury's verdict on ownership,[5] Nelcela's failure to raise the issue of analytical dissection in opposition to the Joint Parties' Motion for summary judgment does not constitute a wavier of Nelcela's challenges to infringement based on analytical dissection in Phase II.

> **B.    Phase II - Infringement**[6]

_____

[4]But see Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1476 (9th Cir. 1992) ("Analytic dissection is relevant not only to the copying element of a copyright infringement claim, but also to the claim's ownership element.").  However, as the Brown Bag court went on to state, analytical dissection is only relevant to the issue of ownership to the extent that it may limit the scope of the copyright depending on the extent the copyright owner's work is unprotected or unprotectable under copyright.  Id.  In other words, analytical dissection merely determines whether a copyright is actionable; while it may render certain constituent parts of a copyright unenforceable, it does not necessarily divest the copyright-holder of ownership.

[5]In its latest briefing, Nelcela states that it "does not challenge" the Court's ruling on probative similarity, i.e. that copying occurred.  (Dkt. #603, p.2).  Clearly, that has not always been Nelcela's position.  See Dkt. #505, pp. 5-11 (arguing that the Court's summary judgment ruling was erroneous due to the Court's failure to perform analytical dissection).

[6]Although the parties continue to argue over aspects of Phase I of this litigation, there is no question that this case is now in Phase II.  Despite Nelcela's assertions to the contrary

1    The issue before the Court is whether Nelcela copied *protected* elements of

2    Lexcel's software.  See Newton v. Diamond, 204 F.Supp.2d 1244, 1253 (C.D. Cal. 2002)

3    (citing Feist Publ'ns, 499 U.S. at 348-51) ("The protectability of elements of a

4    copyrighted work is a question of law for the court."); 4 Nimmer on Copyright § 13.03[F]

5    ("Infringement is shown by a substantial similarity of *protectible* [sic] *expression*, not just

6    an overall similarity between the works.").  To establish infringement, Lexcel must

7    "show[] that the works in question 'are substantially similar in their protected elements.'"

8    Id. (citing Metcalf v. Bochco, 294 F.3d 1069, 1072 (9th. Cir. 2002)).

9    The Ninth Circuit utilizes "a two-part test to determine whether two works are

10   substantially similar: an extrinsic test and an intrinsic test."  Jada Toys, Inc. v. Mattel,

11   Inc., 518 F.3d 628, 637 (9th Cir. 2008); Apple Computer, Inc. v. Microsoft Corp., 35 F.3d

12   1435, 1442 (9th Cir. 1994) ("We have traditionally determined whether copying

13   sufficient to constitute infringement has taken place under a two-part test having

14   'extrinsic' and 'intrinsic' components.").  "At summary judgment, courts apply only the

15   extrinsic test; the intrinsic test, which examines an ordinary person's subjective

16   impressions of the similarities between the two works, is exclusively the province of the

17   jury."  Funky Films, Inc. v. Time Warner Entertainment Co., L.P., 462 F.3d 1072, 1077

18   (9th Cir. 2006); Smith v. Jackson, 84 F.3d 1213, 1218 (9th Cir. 1996) ("If [a] plaintiff

19   satisfies the extrinsic test, the intrinsic test's subjective inquiry must be left to the jury and

20   summary judgment must be denied.").

21

22   (Dkt. #540), the Court allowed Phase II discovery to commence: the parties conducted
23   discovery on the issue of equitable estoppel and the statute of limitations (Dkt. #554), the
     Court has ruled on that issue, and the parties have submitted numerous briefing on the issue
24   of analytical dissection (on which neither party sought additional discovery) (Dkt. #s 550,
     551).  As such, although technically not presented with motions for summary judgment on
25   the parties' respective infringement claims, the briefing submitted addresses the same, and
26   thus this Order will constitute the Court's definitive ruling on the issue of analytical
     dissection.  Further, to the extent that the parties contemplate that additional fact discovery
27   is necessary or additional issues must be presented to the Court with respect to any remaining
28   Phase II issues, the Court will take up those issues at the next status hearing.

1    A plaintiff may satisfy the extrinsic test by providing "'indicia of a sufficient

2    disagreement concerning the substantial similarity of [the] two works.'" Swirsky v.

3    Carey, 376 F.3d 841, 846 (9th Cir. 2004) (quoting Brown Bag, 960 F.2d at 1472).

4    However, "a plaintiff who cannot satisfy the extrinsic test necessarily loses on summary

5    judgment, because a jury may not find substantial similarity without evidence on both the

6    extrinsic and intrinsic test." Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042,

7    1045 (9th Cir. 1994).  Thus, "[s]ummary judgment for a defendant accused of copyright

8    infringement is appropriate when the plaintiff fails to show a genuine issue regarding

9    whether the ideas and expressive elements of the works are substantially similar." Brown

10   Bag, 960 F.2d at 1472.

11   "The extrinsic test considers whether two works share a similarity of ideas and

12   expression as measured by external, objective criteria." Swirsky v. Carey, 376 F.3d 841,

13   845 (9th Cir. 2004); Apple Computer, 35 F.3d at 1442 ("The extrinsic test [ ] objectively

14   considers whether there are substantial similarities in both ideas and expression . . .").

15   However, "it must be kept in mind that ideas by themselves are not subject to copyright

16   protection; only the expression of ideas is." Swirksy, 376 F.3d at 845 n. 4 (citation

17   omitted); see, e.g., Rice, 330 F.3d at 1174 ("Ideas generally do not receive protection,

18   only the expression of such ideas do.") (citing Metcalf, 294 F.3d at 1074); Brown Bag,

19   960 F.2d at 1475 ("The extrinsic test [is] an 'objective . . . analys[is] of expression.'")

20   (quoting Shaw v. Lindheim, 919 F.2d 1353, 1357 (9th Cir. 1990)) (emphasis in original).

21   The extrinsic test involves three basic steps:

22       (1) The plaintiff must identify the *source(s)* of the alleged similarity
         between his work and the defendant's work.  (2) Using analytic dissection,
23       and, if necessary, expert testimony, the court must determine whether any
         of the allegedly similar features are protected by copyright. . . .
24       unprotectable ideas must be separated from potentially protectable
         expression; to that expression, the court must then apply the relevant
25       limiting doctrines in the context of the particular medium involved, through
         the eyes of the ordinary consumer of that product.  (3) Having dissected the
26       alleged similarities and considered the range of possible expression, the
         court must define the scope of the plaintiff's copyright – that is, decide
27       whether the work is entitled to "broad" or "thin" protection.  Depending on
         the degree of protection, the court must set the appropriate standard for a

28

subjective comparison of the works to determine whether, as a whole, they are sufficiently similar to support a finding of illicit copying.

Apple Computer, 35 F.3d at 1443 (emphasis in original).  In other words, the test involves properly identifying the sources of similarity in the works, distinguishing ideas from expression, applying relevant limiting doctrines, and deciding the scope of the copyright by dissecting the unauthorized expression and filtering out unprotectable elements.  See id. at 1443-47.

## III.   APPLICATION OF THE EXTRINSIC TEST

### A.   Burden of Proof

It is well settled that "the plaintiff bears the burden of proof on the *prima facie* case, and the defendant bears the burden as to defenses."  3 NIMMER ON COPYRIGHT § 12.11.  However, copyright registration is presumptive evidence of copyrightability.  See Swirsky, 376 F.3d at 851 ("Because [the work] has a valid certificate of registration with the copyright office . . . [the plaintiff] is entitled to a presumption of originality.") (citing 17 U.S.C. § 410(c) (2003) (presumption extends five years from date of registration)); 3 NIMMER ON COPYRIGHT § 12.11[B][1] ("[A] certificate of registration, properly obtained within the prescribed five-year period, constitutes *prima facie* evidence of the author's originality.").  In addition, in order to establish a *prima facie* case of copying, a plaintiff must prove both access and probative similarity.  Id. at § 12.11[D] ("[W]here the plaintiff has made a strong *prima facie* case of copying by proving both access and a convincing number of similarities so that there is a high probability that copying, whether intentional or unintentional, has in fact occurred, at that point, the burden of going forward . . . shifts to the defendant, who must [ ] negative the probability of copying by evidence of independent creation, or common sources . . . ."); but see Swirsky, 376 F.3d at 844 ("Where a high degree of access is shown, we require a lower standard of proof of substantial similarity.").[7]  Here, during Phase I, the Court found that probative similarity

---

[7]In Swirsky, the plaintiff possessed a valid certificate of registration, and thus the Court held that the plaintiff was entitled to a presumption of originality.  376 F.3d at 851.

1   existed between the Lexcel and Nelcela software, and the jury determined that Lexcel

2   possessed a valid copyright in the Lexcel software; Nelcela does not contest that the

3   Lexcel software is not copyrightable.  See Dkt. #600, p.6.  Therefore, Lexcel has satisfied

4   its *prima facie* burden and is entitled to a presumption of copyrightability.

5           That presumption extends to the Court's use of analytic dissection under the

6   extrinsic test to determine whether any of the allegedly similar features are protected by

7   copyright.  See Apple Computer, 35 F.3d at 1443.  Because Lexcel satisfied its *prima*

8   *facie* burden and was determined to possess a valid copyright, Lexcel is entitled to a

9   presumption that the common features and elements in the Lexcel and Nelcela software

10  are copyrightable.  See Swirsky, 376 F.3d at 851.  As such, contrary to Nelcela's assertion

11  that "it is Lexcel's burden to prove the significance of the elements copied" (Dkt. #603,

12  p.4), the burden in fact shifts to Nelcela to demonstrate why those common features and

13  elements are not protected by copyright.  See Bibbero Sys., Inc. v. Coldwell Sys., Inc.,

14  893 F.2d 1104, 1106 (9th Cir. 1990) ("[A] certificate of registration constitutes *prima*

15

16

_____

17  However, the Ninth Circuit also stated that "[w]here a high degree of access is shown, [the

18  Ninth Circuit] require[s] a lower standard of proof of *substantial* similarity" (emphasis
    added), implying that the plaintiff carries the burden of proof under the extrinsic test despite

19  possessing a valid certificate of registration.  Id. at 844.  But apart from identifying the

20  sources of the similarities in the works (which a plaintiff must do to establish probative
    similarity), the extrinsic test primarily involves analytic dissection and application of the

21  relevant limiting doctrines (the second element).  And analytic dissection or "filtration"
    involves analyzing, among other things, the originality of the work, which is presumed (for

22  a period of five years) by virtue of possessing a valid copyright.  Further, as stated below, a

23  defendant in the Ninth Circuit carries the burden under the extrinsic test of proving that
    limiting doctrines apply.  As such, it would make little sense, when a valid copyright exists,

24  to force a plaintiff to carry the burden of proof on the remaining issues of analytic dissection.
    Therefore, this Court will not interpret Swirsky's reference to proof of *substantial* similarity

25  to imply that a plaintiff, despite possessing a valid copyright, must shoulder the burden of

26  proof as to parts of the second element (analytic dissection and application of the relevant
    limiting doctrines) of the extrinsic test.  There is nothing in Swirsky to convince this Court

27  that to establish a *prima facie* case of copying, a plaintiff must do more than prove the

28  existence of a valid certificate of registration, access, and probative similarity (element one).

1    *facie* evidence of copyrightability and shifts the burden to the defendant to demonstrate

2    why the copyright is not valid."); <u>see also</u> 3 NIMMER ON COPYRIGHT § 12.11[D] (above).

3          Nelcela also argues that Lexcel should carry the burden of proving that the

4    relevant limiting doctrines – here, merger and scènes à faire – do not apply to prevent the

5    copyrightability of the alleged common features and elements between the Lexcel and

6    Nelcela software.  See Dkt. #600, pp. 6-7 (citing, e.g., <u>Maddog Software, Inc. v. Sklader</u>,

7    382 F.Supp.2d 268, 282 (D. N.H. 2005) ("[Plaintiff] has the burden to show that these

8    elements constitute protectable expression with reference to the various doctrines just

9    discussed.").  However, it is clear that in the Ninth Circuit, "[the doctrines of merger and

10   scènes à faire] are defenses to infringement."  <u>Ets-Hokin v. Skyy Spirits, Inc.</u>, 225 F.3d

11   1068, 1082 (9th Cir. 2000); <u>see</u> <u>Satava v. Lowry</u>, 323 F.3d 805, 810 n. 3 (9th Cir. 2003)

12   ("The Ninth Circuit treats scènes à faire as a defense to infringement rather than as a

13   barrier to copyrightability.").  Thus, despite Nelcela's assertion to the contrary, "[Nelcela]

14   must go forward at trial with appropriate evidence as to those doctrines."  4 NIMMER ON

15   COPYRIGHT § 13.03[F][3].

16   **B.    Computer Software**

17          "It is settled that computer programs are entitled to copyright protection.  <u>General</u>

18   <u>Universal Systems, Inc. v. Lee</u>, 379 F.3d 131, 142 (5th Cir. 2004); <u>see</u> <u>Hutchins v. Zoll</u>

19   <u>Medical Corp.</u>, 492 F.3d 1377, 1383 (Fed. Cir. 2007) ("The Copyright Act provides

20   protection against unauthorized copying of computer programs, defined in 17 U.S.C. §

21   101 as 'a set of statements or instructions to be used directly or indirectly in a computer in

22   order to bring about a certain result.'").  "A computer program is made up of several

23   different components, including the source and object code, the structure, sequence and/or

24   organization of the program, the user interface, and the function, or purpose, of the

25   program.  Whether a particular component of a program is protected by a copyright

26   depends on whether it qualifies as an 'expression' of an idea, rather than the idea itself."

27   <u>Johnson Controls, Inc. v. Phoenix Control Systems, Inc.</u>, 886 F.2d 1173, 1175 (9th Cir.

28   1989) (citing <u>Harper & Row Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 547

1   (1985)).  "[Copyright] protection extends not only to the 'literal' elements of computer

2   software – the source code and object code[8] – but also to a program's nonliteral elements,

3   including its structure, sequence, organization, user interface, screen displays, and menu

4   structures."  Gen. Universal Sys., 379 F.3d at 142; see O.P. Solutions, Inc. v. Intellectual

5   Property Network, Ltd., 1999 WL 47191, at *6 (S.D.N.Y. 1999) ("[L]iability will attach

6   where the 'fundamental essence or structure' of one work is duplicated in another, even if

7   the so-called 'literal' elements of the work are not similar.") (quoting Computer

8   Associates Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 701 (2d Cir. 1992)).  It is important to

9   note that "[t]he 'non-literal components' of a computer program, including its user

10  interface, are protectable if, 'on the particular facts of each case, the component in

11  question qualifies as an expression of an idea [not] an idea itself.'"  Apple Computer v.

12  Microsoft Corporation, 799 F.Supp. 1006, 1020 (N.D. Cal. 1992) (quotation omitted)).

13       "Copyrighted software ordinarily contains both copyrighted and unprotected or

14  functional elements."  Sony Computer Entertainment, Inc. v. Connectix Corp., 203 F.3d

15  596, 599 (9th Cir. 2000).  However, copyright protection may be afforded to unprotected

16  elements that constitute "compilations": the "collection and assembling of preexisting

17  materials or of data that are selected, coordinated, or arranged in a way that the resulting

18  work as a whole constitutes an original work of authorship."  17 U.S.C. § 101.  Thus,

19  "even if the constituent elements of a work are not protected, protection may extend to the

20  'selection, coordination, or arrangement' of such elements in the work as a whole."  O.P.

21  Solutions, 1999 WL 47191, at *9; see Satava, 323 F.3d at 811 ("[A] combination of

22  unprotectable elements may qualify for copyright protection."); Metcalf, 294 F.3d at 1074

23  ("[A] particular sequence in which an author strings a significant number of unprotectable

24  _____

25       [8]Computer software contains two types of code: source code and object code.  Source
    code is a textual computer language that is written and readable by human programmers.

26  Source code is then translated by a program called a compiler into object code, the binary
    language that is executed / readable directly by a computer.  See Universal City Studios, Inc.

27  v. Reimerdes, 111 F.Supp.2d 294, 305-06 (S.D.N.Y. 2000) (giving a detailed description of

28  object and source code).

1    elements can itself be a protectable element.  Each note in a scale, for example, is not

2    protectable, but a pattern of notes in a tune may earn copyright protection.").

3          As for computer software, "if constituent elements of a screen display or user

4    interface lack requisite originality, or are outside the scope of copyrightable material

5    under 102(b), or are otherwise unprotectable, the selection, coordination, and arrangement

6    of such elements may be protectable, even though those individual elements are not."

7    O.P. Solutions, 1999 WL 47191, at *9 (citing Apple, 799 F.Supp. at 1023).  However, it

8    is important to keep in mind that "a combination of unprotectable elements is eligible for

9    copyright protection only if those elements are numerous enough and their selection and

10   arrangement original enough that their combination constitutes an original work of

11   authorship."  Satava, 323 F.3d at 811 (citing Feist, 499 U.S. at 358 ("[T]he principle

12   focus should be on whether the selection, coordination, and arrangement are sufficiently

13   original to merit protection.")).

14          **C.    Identification / Abstraction**

15          On August 31, 2007, the Joint Parties submitted a List of Common Features and

16   Elements Between the Lexcel Software and the Nelcela Software, alleging that Nelcela

17   copied both non-literal and literal elements from the Lexcel software.  (Dkt. #555).  The

18   Joint Parties allege that Nelcela copied numerous non-literal elements of the Lexcel

19   software, including "[t]he tasks performed by the Lexcel system . . . . [which] include

20   authorizing, processing, and storing credit card transactions and date," "[t]he computer

21   platform on which the Lexcel System is designed to operate," "[t]he design and layout of

22   the Lexcel System" and the "database used by the Lexcel System," including table and

23   column names and data types."  (Id., p.2).  The Joint Parties also allege that Nelcela

24   copied the following literal elements: program structure, file names, file structures,

25   variable names, definition, and data structures, procedures and functions, formatting,

26   commenting, database structures and definitions (including table and column names and

27   data types), and "[s]ections of source code (including formatting, naming, and

28

1    commenting) copied verbatim from the Lexcel System, including source code from [12]

2    files." (Id., pp. 2-3).[9] [10]

3          First, however, program structure, file names, file structures, variable names,

4    definition, and data structures, procedures and functions, formatting, commenting,

5    database structures and definitions (including table and column names and data types),

6    are not, by themselves, literal elements of computer software. "Literal elements consist

7    of actual computer programming codes." O.P. Solutions, Inc., 1999 WL 47191, at *6. As

8    such, the only literal elements of the Lexcel software that are specifically mentioned in

9    the Joint Parties' List are 12 sections of source code. To the extent that the remaining

10   alleged common features and elements are independently asserted, they are non-literal

11   elements of the Lexcel software. "[A] computer's 'non-literal' elements consist of

12   elements other than the code, and may generally be described as the 'structure, sequence,

13   and organization' of the underlying program." Id. These elements include "general flow

14   charts, as well as the more specific organization of inter-modular relationships, parameter

15   lists, and macros," Altai, 982 F.2d at 702, in addition to features such as screen displays

16   and user interfaces, menus, and "command tree" structures contained on the screens,

17   Mitek Holdings, Inc. v. Arce Eng'g Co., 89 F.3d 1548, 1555 n.15. See Apple Computer,

18   35 F.3d at 1445.

19         Second, although Nelcela does not directly contend that the Joint Parties' List of

20   Common Features and Elements is inadequate, Nelcela does state that "[t]he Joint Parties

21   have not identified in their list of common features (Docket No. 555) or anywhere else in

22

23         [9]The 12 sections of source code are: ACCOUNT.SQL, AUTHDAEM.C, BANK.SQL,
24   CARD.SQL, CMDEXEC.C, CMDEXEC.H, IDR.SQL, INTERCHANGE.H, ISO8583.C,
     ISO8583STRUCT.H, SELECT.SQL, and TABLES. (Dkt. #555, p.3).

25         [10]The Joint Parties' List of Common Features and Elements also includes various
26   sections of source code from the MTSI software. See Dkt. #555, p.3. However, as the only
27   issue presently before the Court is whether Nelcela copied protected elements of the *Lexcel*
     software, the Joint Parties' reference to various sections of the MTSI source code is
28   inapposite.

1   the record, any alleged substantial similarities other than those in [Phase I Trial] Exhibits

2   504 and 509."  (Dkt. #603, p.4).  The Joint Parties counter that "Exhibits 504 and 509

3   [we]re [merely] examples offered at trial of some of the verbatim copying of the Nelcela

4   Software from the Lexcel Software," whereas the List of Common Features and Elements

5   constitutes a "comprehensive list of the similarities between the Lexcel Software and the

6   Nelcela Software."  (Dkt. #602, pp.6-7).

7         The Joint Parties' List of Common Features and Elements represents the

8   identification of the sources of the alleged similarity between the Lexcel software and the

9   Nelcela software under the first step of the extrinsic test.  (Dkt. #601, p.18); see O.P.

10  Solutions, 1999 WL 47191, at *6 ("[I]n cases where 'the copyright holder presents the

11  court with a list of features that it believes to be protectable . . . the court need not abstract

12  further such features.").  Thus, to the extent that the List contains more alleged

13  similarities than those contained in Phase I's Trial Exhibits 504 and 509, the Court must

14  consider those similarities.  However, although the Joint Parties' present a list of features

15  and elements that they maintain are (1) protectable, and (2) were illegally copied by

16  Nelcela, the Joint Parties fail to specifically identify the extent to which Nelcela allegedly

17  copied the Lexcel software's non-literal elements (i.e., the Lexcel software's design and

18  layout, program structure, file names, file structures, variable names and data structures,

19  procedures and functions, formatting, commenting, database structures and definitions).

20  Except for the specific references to the 12 sections of source code that Nelcela allegedly

21  copied from the Lexcel software, the List of Common Features and Elements contains

22  only general allegations of copying.  Nonetheless, the Court will conduct the extrinsic test

23  based on a presumption that the Joint Parties contend that Nelcela copied *all* of the Lexcel

24  software's non-literal elements.  See Dkt. #602, p.10 ("[T]he Joint Parties claim that

25  Nelcela copied the **entire** copyrighted Lexcel database schema.") (emphasis in original).[11]

26

27         [11]A database schema "is the organization and names that the programmer uses to

28  establish a computer database and to reference data stored in the database."  (Dkt. #565,

1

**D.  Analytical Dissection**

2      As noted above, "[b]ecause only those elements of a work that are protectable . . .

3  can be compared when it comes to the ultimate question of illicit copying, [the Court

4  must] use analytic dissection to determine the scope of copyright protection before works

5  are considered 'as a whole.'"  <u>Apple Computer</u>, 35 F.3d at 1443; <u>Thomas v. Walt Disney</u>

6  <u>Co.</u>, 2008 WL 425647, at *2 (N.D. Cal. 2008) ("Under the extrinsic test, the Court

7  defines the scope of copyright protection by 'analytically dissecting' the alleged

8  similarities between the works and separating protected elements of expression from

9  unprotected ideas."); <u>see</u> <u>O.P. Solutions</u>, 1999 WL 47191, at *7 (the abstraction-filtration-

10  comparison test "instructs courts to do what all courts do when evaluating infringement

11  claims: compare the protectable elements of each work to determine whether they are so

12  'substantially similar' as to justify a finding of infringement.").  To conduct analytic

13  dissection, the Court must "filter out as unprotectable the ideas, expression necessarily

14  incident to the idea, expression already in the public domain, expression dictated by

15  external factors (like the computer's mechanical specifications, compatibility with other

16  programs, and demands of the industry served by the program), and expression not

17  original to the programmer or author."  <u>Atari Games Corp. v. Nintendo of America, Inc.</u>,

18  975 F.2d 832, 839 (Fed. Cir. 1992) (citations omitted); <u>see also</u> <u>Apple Computer</u>, 35 F.3d

19  at 1446 ("[T]he unprotectable elements have to be identified, or filtered, before the works

20  can be considered as a whole.").  Analytic dissection, also referred to in other circuits as

21  "filtration," merely "appl[ies] well developed doctrines of copyright law" and may "leave

22  behind a 'core of protectable material.'"  <u>Altai</u>, 982 F.2d at 707 (quoting 3 NIMMER ON

23  COPYRIGHT § 13.03[F][5] at 13-72).

24            1.  Originality & the Idea/Expression Dichotomy

25      As an initial matter, copyright protection extends only to "those elements [of a

26  work] [that] are 'original,' which is to say they are the product of 'independent creation,

27  ─────────────────────

28  p.16).

not novelty.'"  Jada Toys, 518 F.3d at 636 (citation omitted); see Feist, 499 U.S. at 345 (noting that the "sine qua non of copyright is originality," and that "originality is a constitutional requirement").  However, it is important to note that "the definition of originality is broad, and originality means 'little more than a prohibition of actual copying'"; "the author [need only] contribute 'something more than a 'merely trivial' variation.'"  Swirsky, 376 F.3d at 851 (quoting Three Boys Music Corp. v. Bolton, 212 F.3d 477, 485 (9th Cir. 2000)); see Feist, 499 U.S. at 345 (noting that copyright protection is available to those constituent elements of a work that possess more than a de minimis quantum of creativity).

However, while "[c]opyright assures authors the right to their original expression, [it] encourages others to build freely upon the ideas and information conveyed by a work."  Feist, 499 U.S. at 348.  This is referred to as the idea/expression dichotomy; it is codified in 17 U.S.C. § 102(b), and provides that:

> In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b); see also Gen. Universal Sys., 379 F.3d at 142-43 ("Copyright protection does not extend to ideas, processes, facts, elements dictated by considerations of efficiency, elements required by factors external to the program itself, or items taken from the public domain.").  Section 102(b) distinguishes between ideas and functional items (which are not protected) and creative, expressive works (which are protected).

### 2. The Limiting Doctrines

The Court must also apply the relevant limiting doctrines in the context of the particular medium involved – here, computer software – through the eyes of the ordinary consumer.  See Apple Computer, 35 F.3d at 1443.  The relevant limiting doctrines at issue are the merger doctrine and the "scènes à faire" doctrine.

The merger doctrine restricts what otherwise constitutes protectable material by recognizing that although the expression of an idea is entitled to protection, "even

1    expression is not protected in those instances where there is only one or so few ways of

2    expressing an idea that protection of the expression would effectively accord protection to

3    the idea itself." Gennessee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 146 (2d

4    Cir. 1997); Ets-Hokin, 225 F.3d at 1082 ("Under the merger doctrine, courts will not

5    protect a copyrighted work from infringement if the idea underlying the copyrighted work

6    can be expressed in only one way, lest there be a monopoly on the underlying idea.  In

7    such an instance, it is said that the work's idea and expression 'merge.'") (citing CDN

8    Inc. v. Kapes, 197 F.3d 1256, 1261 (9th Cir. 1999); see also Apple Computer, 35 F.3d at

9    1444 ("[W]hen an idea and its expression are indistinguishable, or 'merged,' the

10   expression will only be protected against nearly identical copying.").  "Merger means

11   there is practically only one way to express an idea." Apple, 799 F.Supp. at 1021; see

12   Krofft, 562 F.2d at 1168 n. 10 (merger occurs "[i]f, in describing how a work is

13   expressed, the description differs little from a simple description of what the work is.").

14         "Under the related doctrine of scènes à faire, courts will not protect a copyrighted

15   work from infringement if the expression embodied in the work necessarily flows from a

16   commonplace idea; like merger, the rationale is that there should be no monopoly on the

17   underlying unprotectable idea." Ets-Hokin, 225 F.3d at 1082 (citation omitted); see

18   Apple Computer, 35 F.3d at 1443 ("[S]imilarities derived from the use of common ideas

19   cannot be protected; otherwise, the first to come up with an idea will corner the market.").

20    In particular, with respect to computer software, the scènes à faire doctrine "strips

21   protection from expression made in the form of stock features required by specifications

22   of the computer itself and supported software, or by industry standards and customary

23   programming practices." O.P. Solutions, 1999 WL 47191, at *8 (quotation omitted); see

24   Apple, 799 F.Supp. at 1021 ("[I]f technical or conceptual constraints limit the available

25   ways to express an idea, even though there is more than one avenue of expression

26   available, copyright law will abhor only a virtually-identical copy of the original.").  As

27   such, "[i]f 'market factors play a significant factor in determining the sequence and

28   organization' of a computer program, then those patterns may well be termed ideas

1   beyond the ownership of any one seller."  Apple, 799 F.Supp. at 1023 (quoting Plains

2   Cotton Co-Op v. Goodpasture Computer Serv., 807 F.2d 1256, 1262 (5th Cir. 1987)).

3                              3.  The Alleged Similarities

4          As noted above, the Joint Parties seek protection for both literal and non-literal

5   elements in the Lexcel software.  The non-literal elements contained in the Joint Parties'

6   List of Common Features and Elements concern the database schema of the Lexcel

7   software, i.e., the utilization of a single database, the design and layout of the database,

8   the accompanying database structures and definitions (table and column names and data

9   types), file names and structures, procedures, functions, formatting, commenting and the

10  like.  See O.P. Solutions, 1999 WL 47191, at *10 (noting that non-literal elements refer to

11  elements such as the organizational structure of the actual program, as opposed to the

12  internal operation of the program).  However, the Joint Parties' list of similarities also

13  references 12 sections of source code (literal elements) that were allegedly copied

14  verbatim from the Lexcel software.  As such, Lexcel seeks to protect not only underlying

15  elements of its program, but also the "unique selection and arrangement" of its features.

16                              i. Non-literal Elements

17         The Joint Parties state that "Lexcel does not seek copyright protection for [its]

18  non-literal elements in isolation, but rather seeks protection of the combination of the

19  identified non-protectible elements."  (Dkt. #601, p.19).  In response, Nelcela states that

20  "[a]lthough the Joint Parties' claim copying of a database schema, their own expert

21  offered no evidence of a database schema."  (Dkt. #603, p.5).  But the Joint Parties clearly

22  set forth those non-literal elements and features that they contend constitutes a protectable

23  compilation of unprotectable elements (Dkt. #555, p.2; Dkt. #601, pp. 18-19); they do not

24  simply argue "that the few field names that are identical in the Lexcel and Nelcela

25  software constitute a protectable compilation" (Dkt. #603, pp. 4-5).  Regardless, for some

26  unknown reason, Nelcela merely argues that the field names in the Lexcel software do not

27  constitute protectable expression, as they are unoriginal and also unprotectable under the

28

1  scènes à faire doctrine as they naturally flow "from the industry custom of labeling fields

2  to identify content and the required content dictated by the Visa Regulations."  (Id., p.5).

3      Clearly, isolated field names "are not original, are within the public domain, and

4  are not entitled to individual protection."  <u>O.P. Solutions</u>, 1999 WL 47191, at *15; <u>CMM

5  Cable Rep, Inc. v. Ocean Coast Props.</u>, 97 F.3d 1504, 1519 (1st Cir. 1996) ("It is

6  axiomatic that copyright law denies protection to 'fragmentary words and phrases' and to

7  'forms of expression dictated solely at functional considerations' on the grounds that

8  these materials do not exhibit the minimal level of creativity necessary to warrant

9  copyright protection.") (citing 1 NIMMER ON COPYRIGHT (1985 ed.) § 2.01[B] at 2-13-18;

10  37 C.F.R. § 202.1(a)).  That is relatively undisputed.  See Dkt. #602, p.9 ("[C]opyright

11  law does not protect individual, commonplace words.").  In addition, the Court agrees

12  with Nelcela's expert's testimony that the particular field names in the Lexcel software

13  may be logically related to the names in the Visa Regulations, and primarily consist of

14  "industry standard abbreviations of a wide variety of data elements and data fields that are

15  used commonly throughout the industry."  (Dkt. #600, p.10).  Although the Joint Parties'

16  expert posited that Lexcel's field names "could have been named differently," the Joint

17  Parties do not necessarily disagree that programmers generally use stereotypical

18  expressions and chose field names that express the content of the data elements (such as

19  abbreviating "authorization" as "auth," not "Jayhawks"); they do not use arbitrary field

20  names.  This is a prime example of the merger doctrine: there are only so few ways of

21  expressing the particular idea that protection of the expression would effectively accord

22  protection to the idea itself.  <u>See</u> 4 NIMMER ON COPYRIGHT § 13.03[F][e][iii]

23  ("[A]lternative possibilities cannot, by themselves, vouchsafe copyrightability.").  In

24  addition, individual field names are unprotected under the scènes à faire doctrine as they

25  are generally a result of customary programming practices.  <u>See</u> <u>O.P. Solutions</u>, 1999 WL

26  47191, at *14 ("Individual fields . . . do not constitute original expression, but rather are

27  abbreviations for commonplace terms, and as such are unoriginal and uncopyrightable.").

28

However, the coordination, selection, and arrangement of these field names, as well as the fields and field types themselves, formatting, and commenting, may be entitled to protection as a compilation so long as they "are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship."  Satava, 323 F.3d at 811.  While the mere "decision to combine unprotectable elements does not render the resulting product original," Situation Management Systems v. ASP Consulting Group, 2008 WL 538808, at *7 (D. Mass. 2008), "the selection, coordination, and arrangement" of unprotectable elements may be sufficiently original to merit protection, Feist, 499 U.S. at 358.  See also Apple Computer, 35 F.3d at 1445 ("[O]riginal selection and arrangement of otherwise uncopyrightable components may be protectable.").

Nelcela contends that although its use of inconsistencies in the abbreviations used for terms in the Lexcel software implies that factual copying occurred, "these discrepancies do not establish that the choices made by Lexcel constitute protectable expression.  There remain only a few ways to abbreviate the names in the Visa regulations, and the abbreviations chosen by Lexcel are standard and commonplace." (Dkt. #600, p.13).  But in comparing just 44 lines of the Lexcel and Nelcela software, Dr. Posner, the Joint Parties' expert, found that "the definitions [in the Lexcel and Nelcela software] are identical down to the last character including order of fields, field types, names, formatting, and comments."  (Dkt. #337, p.19).  Dr. Posner went on: "If we make the ridiculously conservative assumption that the odds of exactly duplicating a single line by accident are 1 in 2 then the odds of getting 44 consecutive matches . . . is greater than 10 trillion to 1."  (Id.).  That supports the proposition that while individual field names may be limited in their expression / abbreviations, certainly when incorporated into lines of code, they may become numerous enough and their selection and arrangement original enough that their combination constitutes an original work.  See Hutchins, 492 F.3d at 1384 ("Copyright does not protect individual words and 'fragmentary' phrases when removed from their form of presentation and compilation.  Although the compilation . . .

1  may be subject to copyright in the form in which it is presented."); Apple Computer, 35

2  F.3d at 1439 ("[P]rotectable substantial similarity cannot be based on the mere use of

3  overlapping windows, although, of course, Apple's *particular expression* may be

4  protected.") (emphasis in original).

5       In addition, this is not a instance where "[t]he similarity of [ ] functional elements.

6  . . or their arrangement in products of like kind [amounts to] standardization across

7  competing products for functional considerations." Apple, 799 F.Supp. at 1023.  There is

8  insufficient information to suggest that Nelcela's use of the exact arrangement of the field

9  names in Lexcel's software amounts to standardization across like software for functional

10  considerations; nor is there anything to suggest that common sense or efficiency

11  considerations dictated Nelcela's use of the same abbreviations in the exact order as

12  Lexcel.[12]  Thus, the Court cannot conclude that no reasonable juror could not find

13  creativity in the selection and arrangement of the Lexcel software's field names, let alone

14  the remaining allegedly similar non-literal elements of the Lexcel software, sufficient to

15  render the compilation original enough for protection.

16

17

18

19

20

21

22

23

24      [12]Despite Nelcela's assertion to the contrary, the determination that Lexcel's field
names and abbreviations are not necessarily limited as scènes à faire is supported by the fact
25  that Nelcela's expert, Mr. Pell, abbreviated several field names differently than the
abbreviations used in the Lexcel and Nelcela software.  See Dkt. #600, pp. 11-12 n. 7; Dkt.
26  #602, p.9 n. 3.  The evidence presented supports neither a finding that Lexcel's non-literal
elements are merely a result of external considerations (such as software or design standards,
27  or programming practices and techniques) nor an inference of independent creation on the
part of Nelcela.
28

- 24 -

1                                    ii. Literal Elements

2          The Joint Parties allege that Nelcela copied verbatim portions, including

3   formatting, naming, and commenting, of 12 of Lexcel's source codes.  (Dkt. #565, p.10;

4   Dkt. #601, pp. 19-20).  Specifically, with respect to five of Lexcel's source codes –

5   ACCOUNT.SQL, CARD.SQL, IDR.SQL, SELECT.SQL, and TABLES – the Joint

6   Parties allege that Nelcela copied numerous database table and column names.  (Dkt.

7   #565, pp. 10-12; Dkt. #601, pp. 20-23).  With respect to AUTHDAEM.C, CMDEXEC.C,

8   CMDEXEC.H, INTERCHANGE.H, and ISO8583STRUCT.H, Lexcel alleges that

9   "almost the entirety of the Lexcel file[s], including variables, parameters, formatting, and

10  the unique way in which Lexcel chose to express the functionality performed by the

11  file[s] appear verbatim in the Nelcela file[s]."  (Id.).  The Joint Parties assert that "entire

12  passages of code were copied word-for-word by Nelcela, complete with discretionary

13  word choices, misspellings, and even blank programmer comments," and that the Lexcel

14  code was not dictated by the programming language or VISA regulations.  (Dkt. #565,

15  p.12).  Nelcela, on the other hand, refers to the similarities between the Lexcel and

16  Nelcela source code as "fragmented literal similarity"[13] (Dkt. #600, p.16), resulting from

17  standard programming techniques and efficiency concerns (id., p.17; Dkt. #603, p.5).

18  Specifically, Nelcela argues that "every bit of highlighted code: 1) is found in the public

19  domain, i.e., 'Sybase' manuals or 'standard, common' 'C' code that must be used in every

20  'C' program ever written; 2) is standard VisaNet data that must be included in any

21  authorization system for functionality in order to send to or receive data from VISA;

22  and/or 3) is standard functionality to place an 'asterisk' icon on the screen while the

23  program runs.  None of these items is protected by copyright."  (Dkt. #560, pp. 14-15).

24

25
_____

26         [13]"Fragmented literal similarity exists where the defendant copies a portion of the
    plaintiff's work exactly or nearly exactly, without appropriating the work's overall essence
27  or structure."  Newton v. Diamond, 388 F.3d 1189, 1195 (9th Cir. 2004) (citing 4 NIMMER
    ON COPYRIGHT § 13.03[A][2], at 13-45).
28

1        First, as discussed in the preceding section, to the extent that the Joint Parties

2   allege that Nelcela copied database table names and column names from the identified

3   source code, only the selection, coordination, and arrangement of that information is

4   subject to protection.  Second, with respect to the remaining source code, it appears

5   undisputed that the programming languages used by Lexcel afford multiple ways to

6   express the functionality in the Lexcel source code (Dkt. #565, p.13), it is also true that

7   copyright is not afforded to "programming practices and techniques that have become

8   widely used and accepted in the computer software industry."  4 NIMMER ON COPYRIGHT

9   § 13.03[F][e].  As such, it is hard to imagine that code implementing an ISO error

10  message or displaying a spinning asterisk while the computer is functioning does not

11  constitute an unprotectable "procedure, process, system [or] method of operation" under

12  17 U.S.C. § 102(b).  In addition, as an example, Nelcela's expert testified that the

13  ISO8583 include function appears in "just about every authorization system" as a

14  common format to exchange transaction information, and other code identified by Lexcel

15  appear to utilize standard programming techniques.  (Dkt. #600, p.18).  Clearly, "[t]he

16  mere fact that similar practices or techniques are employed in two programs is tenuous

17  evidence at best of copying."  4 NIMMER ON COPYRIGHT § 13.03[F][e][ii]; Altai, 982 F.2d

18  at 708 ("Since . . . there may be only a limited number of efficient implementations for

19  any given program task, it is quite possible that multiple programmers, working

20  independently, will design the identical method employed in the allegedly infringed work.

21  Of course, if this is the case, there is no copyright infringement") (citations omitted).

22       However, "[c]omputer programming is a highly creative and individualistic

23  endeavor," id., and source code is "consistently held protected by a copyright of the

24  program," Johnson Controls, 886 F.2d at 1175.  Even Nelcela's expert recognized that

25  Lexcel exercised at least some discretion when programming its source code, including in

26  Lexcel's comments (which does not add to the software's functionality) (Dkt. #565,

27  p.12).  Nonetheless, the Court cannot find based on the evidence presented that the Lexcel

28  source code, while not necessarily dictated by external constraints, does not generally

1   result from standard programming techniques and/or efficiency considerations, especially

2   in light of the software's need to comply with VISA regulations (in processing and

3   storing data).

4   　　　But this case does not involve general copying of standardized elements.  It

5   involves verbatim copying of numerous parts of source code, including commenting, that

6   are simply not by functionality, efficiency, or compliance with the VISA regulations.

7   (Dkt. #565, pp. 12-17).  Although Lexcel seems to overstate the sheer number of ways in

8   which a programmer would develop source code to comply with the VISA regulations,

9   the Court cannot alternatively conclude that the Lexcel source code consists only of

10  commonly known techniques and material strung together without significant originality

11  or skill.

12  　　　The Court finds it helpful here to look at what happened in Altai.  There,

13  approximately 30 percent of the defendant's software was copied directly from the

14  plaintiff's software.  Altai, 982 F.2d at 700.  But once the defendant discovered that

15  copying had taken place, it locked away the code and rewrote the 30 percent of copied

16  code using untainted employees.  Id.  The result?  Although the defendant's original

17  software clearly constituted infringement of the plaintiff's software, the Second Circuit

18  found that the similarities between the plaintiff's software and the defendant's *rewritten*

19  software were merely a result of external factors, such as the software's functionality, and

20  thus did not constitute copyright infringement.  Id. at 714-15.  The instant action is more

21  akin to the unchallenged finding of infringement between the plaintiff's software and

22  defendant's original software.  Although perhaps, in some other instance, external

23  constraints and considerations could lead programmers to independently create the Lexcel

24  software at issue (both literal and non-literal elements), that is simply not the case here.

25  Here, the evidence simply does not support a finding that the similarities in both literal

26  and non-literal elements between the Lexcel and Nelcela software constitute only

27  "functional elements and elements taken from the public domain [that] do not qualify for

28  copyright protection."  Id. at 714.  The evidence supports factual copying of elements that

1  extend beyond the dictates of external constraints; there is at the very least "'indicia of a

2  sufficient disagreement concerning the substantial similarity of [the] two works.'"

3  Swirsky, 376 F.3d at 846 (quoting Brown Bag, 960 F.2d at 1472).  Thus, the Court cannot

4  conclude that the Lexcel source code lacks sufficient originality to not warrant protection.

5        **E.    Comparison / Scope of Protection**

6        The Court must now define the scope of Lexcel's copyright – that is, decide

7  whether the Lexcel software is entitled to "broad" or "thin" protection.  Then, depending

8  on the degree of protection, the Court must set the appropriate standard for the intrinsic

9  test, i.e., subjective comparison of the Lexcel and Nelcela software by the trier of fact to

10  determine whether they are sufficiently similar to support a finding of illicit copying.  See

11  Apple Computer v. Microsoft Corp., 821 F.Supp. 616, 623 (N.D. Cal. 1993) ("[A]fter

12  filtering out all unprotectable elements, the court's substantial similarity inquiry [must]

13  focus on the remaining 'core of protectable expression,' and whether defendant copied

14  any aspect of this protected expression, as well as 'the copied portion's relative

15  importance with respect to the plaintiff's overall program.'") (quoting Altai, 982 F.2d at

16  710).

17        In making this determination, the Court notes that "[b]roader protection is

18  generally accorded to artistic works and other analogous works because of the endless

19  variations of expression that are available in such works; in those cases, the appropriate

20  standard under the intrinsic analysis is substantially similar copying."  Apple Computer,

21  35 F.3d at 1446-47 (citation omitted).  On the other hand, if the range of possible

22  expression is narrow, then the works are afforded only "thin" protection and the

23  appropriate standard under the intrinsic analysis is virtual identity.  Id. at 1439; see also

24  Harper House, Inc. v. Thomas Nelson, Inc., 889 F.2d 197, 205 (9th Cir. 1989) ( works

25  consisting largely of uncopyrightable elements receive only limited copyright protection).

26        In addition, there are only two instances where a court may find noninfringement

27  as a matter of law: "[E]ither when the similarity concerns only noncopyrightable elements

28  of plaintiff['s] work, or when no reasonable trier of fact could find the works substantially

1    similar." Walker v. Time Life Films, Inc., 784 F.2d 44, 48 (2d Cir. 1986); see also Aliotti
2    v. R. Dakin & Co., 831 F.2d 898, 901 (9th Cir. 1987) ("[N]o substantial similarity may be
3    found under the intrinsic test where analytic dissection demonstrates that all similarities in
4    expression arise from the use of common ideas.").  Here, as discussed above, the Joint
5    Parties have demonstrated that some of the elements of the Lexcel software constitute
6    copyrightable subject matter – in particular, some of the portions of Lexcel's source code
7    (those involving more than naming conventions), and more persuasively, the selection,
8    coordination, and arrangement of the information contained in the Lexcel software's
9    database schema (non-literal elements) and source code (those involving copying of table
10   and column names).  As such, Nelcela may not secure summary judgment of non-
11   infringement on the ground that the similarities concern only noncopyrightable elements
12   of Lexcel's work.  Instead, Nelcela's request must rest on the ground that no reasonable
13   trier of fact could find the works to be sufficiently similar.

14          Here, because the non-literal elements of the Lexcel software are protectable only
15   as compilations, they are subject to "thin" protection.  See O.P. Solutions, 1999 WL
16   47191, at *9 ("Protection of compilations is thin, as it is limited to just 'those components
17   of a work that are original to the author,' [Feist,]499 U.S. at 348  . . .").  In addition,
18   although the portions of Lexcel's source code that were allegedly copied by Nelcela are
19   protectable (either independently or as a compilation) as they have not been shown to be
20   sufficiently unoriginal, given the Court's additional determination that some of the
21   protectable elements are not subject to endless variations of expression, the Court is
22   unable at this time to afford them broad protection.  Regardless, even if the Court were to
23   afford them such protection, "[t]he fact that the work as a whole may be composed of a
24   few individual elements protectible under the substantial similarity standard should not
25   imply that the substantial similarity standard applies to the work as a whole." Apple
26   Computer v. Microsoft Corp., 1993 WL 207982, at *2 (N.D. Cal 1993).  As a result, the
27   Lexcel's literal elements will also be afforded only "thin" protection.  See Satava, 323
28   F.3d at 812 ("Satava's copyright on these original elements (or their combination) is

1    'thin,' however, comprising no more than his original contribution to ideas already in the

2    public domain.").  Accordingly, the appropriate standard under the intrinsic analysis is for

3    the trier of fact to compare the works for virtually identical copying, <u>Apple Computer</u>, 35

4    F.3d at 1439, and thus infringement will lie only if the protectable elements differ from

5    one another by no more than a trivial degree, <u>O.P. Solutions</u>, 1999 WL 47191, at *21.

6         Of course, "it is important to note that even though some aspects of the programs

7    may be dissimilar, that fact alone will not preclude a finding of infringement.  Rather . . .

8    a defendant will escape liability only where the copied, protectable elements constitute an

9    insignificant portion or aspect of the work in question."  <u>O.P. Solutions</u>, 1999 WL 47191,

10   at *21.  Importantly,

11        [i]t is only when the similarities between the protected elements of
          plaintiff's work and the allegedly infringing work are of 'small import
12        quantitatively or qualitatively' that the defendant will be found innocent of
          infringement.
13

14   <u>Williams v. Crichton</u>, 84 F.3d 581, 587 (2d Cir. 1996).  Therefore,

15        [i]n some cases, the amount of material copied will be so small as to be *de
          minimis*, and will not justify a finding of substantial similarity.  In other
16        cases, however, even a quantitatively small amount of copied material may
          be sufficiently important to the operation of plaintiff's program to justify a
17        finding of substantial similarity.

18   4 NIMMER ON COPYRIGHT § 13.03[F][5]; <u>see also</u> <u>Apple Computer</u>, 821 F.Supp. at 624

19   ("[Q]uantitatively insignificant infringement may be substantial if the material is

20   qualitatively important to [the] plaintiff's work.").  Thus, Nelcela will not escape liability

21   unless it can show that the protectable elements in the Lexcel software constitute an

22   insignificant (quantitatively and qualitatively) portion or aspect of the Lexcel software.

23        Based on the evidence presented, the Court is unable to find, as a matter of law,

24   that "no reasonable juror could conclude" that the protected elements of the works do not

25   differ by more than a trivial degree.  Although Nelcela asserts that the Joint Parties cannot

26   satisfy the intrinsic test because "[l]ess than the 'entire' Lexcel Authorization System as a

27   whole" (Dkt. #600, p.19), Nelcela is reminded that "the relevant inquiry is whether a

28   substantial portion of the protectable material in [*Lexcel's*] work was appropriated–not

1  whether a substantial portion of *defendant's* work was derived from plaintiff's work."

2  Worth v. Selchow & Righter Co., 827 F.2d 569, 570 n. 1 (9th Cir. 1987) (emphasis in

3  original).  In addition, the Joint Parties assert that the Lexcel database schema "is key to

4  the entire functioning of the Lexcel authorization and merchant systems, much like an

5  engine is to a car."  (Dkt. #602, p.11).  It is for the jury to resolve this dispute; the jury

6  must determine whether the protectable elements of the two works differ in more than a

7  trivial degree, and, if not, whether those elements are of sufficient importance to the

8  works as a whole to render Nelcela guilty of infringement.  Thus, because there are

9  disputed issues of material fact concerning whether the Lexcel and Nelcela software are

10 similar enough to support the Joint Parties' claim, summary judgment may not be granted.

11 **IV.   SUMMARY**

12        As previously mentioned, this action is currently in Phase II, the

13 Infringement/Damages phase.  The parties have already engaged in discovery on the issue

14 of the statute of limitations, and the Court has ruled that the issue of whether equitable

15 estoppel acts to bar Lexcel's infringement claim involves questions of fact reserved for

16 the jury in Phase II.  In addition, this Order rules on the issue of analytical dissection and

17 finds that the jury in Phase II must determine whether the similarities between the

18 protected elements in the Lexcel and Nelcela software differ by no more than a trivial

19 degree (which includes an inquiry into the qualitative and quantitative significance of the

20 protected elements).

21        Moreover, while the Court indicated at the March 11, 2008 hearing that the Joint

22 Parties could resubmit their Motion for Partial Summary Judgment on Nelcela's Claims

23 of Copyright Infringement, Conversion, and Aiding and Abetting Tortious Conduct after

24 the Court's ruling on the issue of analytical dissection (Dkt. #597, pp. 107-08), that no

25 longer seems necessary.  In light of the forgoing discussion concerning the Court's

26 September 30, 2006 Order on Phase I Summary Judgment, the Jury's April 24, 2007

27 verdict on ownership, and the instant Order on Analytical Dissection, Nelcela's claims of

28

1   Copyright Infringement, Conversion, and Aiding and Abetting Tortious Conduct (Dkt.

2   #399, pp. 11-14) appear moot.

3   　　As discussed in depth above, the issue of copyright ownership has been

4   determined; Lexcel owns the identified and copyrightable portions of the Merchant and

5   Authorization systems at issue in this case.  Although Nelcela argues in its Response to

6   the Joint Parties' Motion for Partial Summary Judgment, that its copyright infringement

7   claim is still actionable because "even if the Nelcela Merchant System is an unauthorized

8   derivative work, no precedent conveys ownership of the material contributed by Alec

9   Dollarhide or others" (Dkt. #562, p.2), the Court is not aware of any "material contributed

10  by Alec Dollarhide or others" in the Nelcela software that Nelcela has identified as being

11  copied by the Joint Parties apart from what has already been found to be owned and/or

12  copied from the Lexcel software.  The ownership phase is over; Phase II is well under

13  way.  Nelcela was afforded a full and fair opportunity during Phase I to identify the

14  material in the Nelcela software that it contends is original and was copied by the Joint

15  Parties (Dkt. #s 323-25, 349); the Court need not consider any new arguments with

16  respect to ownership at this late stage.  See, e.g., Alaska Center for Environment v. U.S.

17  Forest Service, 189 F.3d 851, 858 n. 4 (9th Cir. 1999) ("Arguments not raised in opening

18  brief are waived."); Giddings v. Vision House Production, Inc., 584 F.Supp.2d 1222,

19  1226 (D. Ariz. 2008) ("Where a plaintiff sets forth one theory in the complaint and does

20  not move to amend until summary judgment proceedings, it is barred from proceeding on

21  a new theory."); Lloyd v. Ashcroft, 208 F.Supp.2d 8, 11 (D.D.C. 2002) ("A plaintiff

22  cannot change the theory of his case in his post-trial motion in order to survive a Rule 50

23  motion for judgment as a matter of law.  He is bound by what he pled and attempted to

24  prove at trial.").  Nelcela's copyright infringement claim was rendered moot by Phase I.[14]

25

26  　　[14]This holding does not apply to Nelcela's claims as they relate to the POST parties
    (POST Integrations, Inc., Ebocom, Inc., Ebocom, LLC, Mary Gerdts, and Douglas
27  McKinney).  See Dkt. #468 (pre-trial stipulation between the Nelcela and the Joint Parties
28  that "[t]he Nelcela Parties' allegations that [the POST parties] stole, infringed upon or

1      In addition, Nelcela's conversion claim is no longer actionable.  "[C]onversion

2  claims with respect to intellectual property arise from the reproduction, copying and

3  misuse of a work. . . . [and] are 'clearly equivalent to [those of] a copyright claim.'"

4  Meridian Project Systems, Inc. v. Hardin Const. Co., LLC, 2006 WL 1062070, at *4

5  (E.D. Cal. 2006).  Thus, "to the extent that [Nelcela] alleges the conversion of

6  [copyrightable or] otherwise noncopyrightable intellectual property contained within [the

7  Nelcela software], the [conversion] claim is preempted by the Copyright Act."  Id.

8  However, "[t]he conversion of tangible property does not fall within the scope of

9  copyright protection."  Id. at *2.  "[A] claim for conversion of physical property requires

10 plaintiff to demonstrate that defendants wrongfully obtained possession over a specific

11 piece of property."  Id. at *2 (citing Oddo v. Ries, 743 F.2d 630, 635 (9th Cir. 1984)).

12     But in its claim for conversion, Nelcela does not specifically allege the conversion

13 of tangible property such as disks, files, and other related Nelcela documentation.  See

14 Dkt. #399, ¶¶ 60-70; see also Meridian Project, 2006 WL 1062070, at *3.  Nelcela's

15 claim focuses on the conversion of intangible property, i.e., "the portions of the Nelcela

16 Merchant System created by Alec Dollarhide (or others) without an appropriate license."

17 (Dkt. #562, p.3) ("For example, Nelcela would have the right to remove any preexisting

18 Lexcel software form the Nelcela Merchant System and license the resulting software on

19 an exclusive or nonexclusive basis.").  Nelcela's conversion claim arises from allegations

20 of the Joint Parties' alleged "reproduction, copying and misuse" of independently created

21 (and unidentified) portions of the Nelcela software.  "[S]uch rights are 'clearly equivalent

22 to [those of] a copyright claim.'"  Meridian Project, 2006 WL 1062070, at *4 (quoting

23 Firoozye v. Earthlink Network, 153 F.Supp.2d 1115, 1130 (N.D. Cal. 2001)).  As such,

24

25 ───────────────

26 otherwise had access to, the Nelcela source code, including, but not limited to, access across
27 the VPN line, shall be preserved for phase two of this litigation and all issues relating to
   ownership of POST's code and alleged infringement by POST shall be preserved for phase
28 two.")

1   because Nelcela's copyright claim was rendered moot after Phase I, Nelcela's conversion

2   claim (and related aiding and abetting claim) was also rendered moot by Phase I.

3          **Accordingly,**

4          **IT IS HEREBY ORDERED** that this Order constitutes the Court's definitive

5   ruling on the issue of analytic dissection.

6          **IT IS FURTHER ORDERED** setting this case for a Status Hearing on April 14,

7   2009, at 1:30 p.m, at which counsel are directed to be physically present.  The parties are

8   directed to meet and confer prior to the hearing and be prepared to discuss any remaining

9   issues in Phase II of this litigation, in addition to setting this case for trial on the issues of

10  infringement and damages.

11         DATED this 17th day of March, 2009.

12

13

14   _____

15                   Mary H. Murguia
                United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28